**DENISON v. MOORE et al.**

No. 14690.

Court of Civil Appeals of Texas.
Fort Worth.

May 25, 1945.

W. H. Reid, of Dallas, and Bryan, Stone, Wade & Agerton and J. B. Wade, all of Fort Worth, for appellant.

Rawlings, Sayers & Scurlock and Nelson Scurlock, all of Fort Worth, for appellee Elizabeth Rogers Porter.

A. L. Camp, of Fort Worth, for appellee H. A. Moore.

SPEER, Justice.

This is an appeal by F. L. Denison, trustee, from an adverse judgment rendered by the court without a jury trial, in an action by Denison, trustee, against H. A. Moore. and one Nye; last-named defendant was, for lack of interest in the subject matter, discharged without complaint by any one.

Denison was trustee for his two sons in handling certain properties, and it becomes unnecessary to go into that matter.

Denison sought establishment of an indebtedness of the principal sum of $1,500 evidenced by five described vendor's lien notes and a foreclosure of the lien against certain lands in Tarrant County.

Mrs. Elizabeth Rogers Porter, a feme sole, intervened and claimed to have purchased the land securing the notes, and that she had paid off the indebtedness, and procured a release of the lien from the record owner of the debt and lien. The release to her was dated January 26, 1942, and was executed by J. R. Sikes, the then record owner of the notes and lien.

As we view the record, the controlling point in the case is: Was Denison, at the time he instituted the suit, an innocent purchaser or holder in due course of the negotiable vendor's lien notes? The answer to this question involves many phases of the Negotiable Instruments Act. Vernon's Ann.Civ.St. art. 5932 et seq. Intermingled with the circumstances under which the notes came into Denison's possession are a series of highly complicated dealings between W. J. Donald, J. M. Donald, J. R. Sikes, R. J. Murray and R.

H. Burck, none of whom were parties to the suit. Over a period of time between November 29, 1941, and January 29, 1942, there were trades pending between Denison and Murray, and between certain of those above named as not being parties to the suit. Apparently there were at least three and maybe four deals pending at the same time, each of which had so many conditions and provisos involved that it is impossible to tell from the record just whose deal was closed according to the conditions imposed. The several trades concerned a half dozen or more tracts of land in Dallas, Fort Worth, Mineola, farm land in Bell County, a brick building in Whitney, Hill County, and 320 acres in Montana.

At the request of Denison, the trial court filed findings of fact and conclusions of law. Denison (appellant) was dissatisfied with practically all of the court's fact findings and conclusions. There are 54 points of error assigned, but substantially all, except the first six points, complain because the fact findings are not supported by the evidence or that the court should· have found certain other facts.

R. H. Burck was a real estate broker living at Whitney, Hill County, during the times involved and had previously made trades with and for the Donalds, Sikes, Murray and Denison. Burck was also involved in each of the pending trades leading up to this controversy. Burck testified by deposition at the trial, but had died about three months before the case was tried. Sikes could not be located and did not testify. W. J. Donald did not testify but was represented throughout all the deals by his brother, J. M. Donald, a practicing attorney, who testified at the trial.

Since there was no jury, the trial court was most liberal in admitting many forms of hearsay testimony, but there is nothing to indicate that he considered any part of it that was incompetent.

The pertinent facts found by the court are that W. J. Donald was the owner of a series of vendor's lien notes amounting to $1,500 secured by a lien on the Fort Worth property; that W. J. Donald was represented throughout these transactions by his lawyer-brother, J. M. Donald. The plaintiff Denison, in the capacity in which he sued, owned a note for the principal sum of $800 executed by R. J. Murray; $200 had been paid on the principal, but the remaining principal and accrued interest were due and unpaid. Denison asked

Burck to assist him in collecting the Murray note. Upon this request by Denison, Burck, a real estate broker, attempted to work out a series of trades whereby Donald would sell the notes in question and other property to Sikes, that Sikes would sell the notes and other property to Murray and Murray would, in turn, sell the notes and other property to Denison. In the last-mentioned deal it was contemplated that Denison would release Murray from all liability on the $800 note and for an independent consideration would sell to Murray a building in Whitney, Texas. While the various transactions related were pending, conditioned upon the several sales referred to, Denison met Burck in Hillsboro and consummated the sale to Murray of the Whitney building. At that time Burck promised Denison that he would consummate the trade whereby Murray would get the notes in question in order that they might be delivered to Denison in consideration of the cancellation and release of the Murray $800 note to Denison. In order to complete the several deals Burck was attempting to make, he went to Bowie and contacted Donald and procured the notes in controversy together with an assignment or transfer by the payee to J. R. Sikes and the notes were endorsed in blank by the payee. These notes and transfer were delivered by Donald to Burck with instructions that they might be exhibited to J. R. Sikes and subsequently delivered to Sikes when the trade between Donald and Sikes was consummated. One of the terms of the proposed trade between Donald and Sikes was that Donald should receive $1,250 in cash and Burck advised him that Sikes owned property in Mineola which could be sold and the money used for that purpose. When Burck returned from Bowie he exhibited to Murray the notes in question and the transfer stating in effect that they were the notes which he (Murray) would get when the trade was consummated. Shortly after Burck obtained the notes from Donald, as above indicated, he contacted Denison and the latter was "disgruntled" because Burck had not obtained the notes sooner and delivered them to him. At this meeting Burck informed Denison that he had no authority to deliver the notes to Denison but that Donald was going to sell them to Sikes. At the end of the controversy Burck pitched the notes and transfer down on a table and departed. When Denison examined the papers he saw that the notes were accompanied by the transfer from Donald to Sikes. Denison then called upon Murray to obtain a transfer from Sikes whereby the notes would be transferred by Sikes to Denison, but Sikes refused to execute the transfer. Since Denison was unable to get the transfer from Sikes he refused to release Murray from his obligation on the $800 note, but determined that he would hold the vendor's lien notes as collateral security for the payment of the balance on Murray's $800 note. Some time later Murray paid the balance due on his note to Denison and it was only then that Denison released the lien to Murray. Several weeks later Donald learned that intervener, Mrs. Porter, was attempting to buy the Fort Worth property, and he wrote Mrs. Porter a letter dated January 8, 1942, stating he was the owner of the notes and that Denison was holding them unlawfully. Sometime thereafter Donald did consummate a trade with Sikes which was similar, but in some respects different, from that originally contemplated and discussed between Donald and Burck. To consummate the last-mentioned deal, Donald executed and delivered to Sikes another transfer of the notes on January 23, 1942. This transfer was delivered and filed for record. The original transfer from Donald to Sikes was still in the possession of Denison and had never been filed for record. Mrs. Porter purchased the property in Fort Worth and paid Sikes for a release or transfer of the notes in question; however, at the time Mrs. Porter purchased the property she had notice of the claim of Denison.

From the foregoing facts the court concluded as a matter of law that Denison did not become the owner of the notes and determined that he would not release Murray's obligation to him on the $800 note but would hold the vendor's lien notes as collateral security therefor. That Denison was not a holder in due course of the vendor's lien notes in that he had actual notice of the fact that Burck was not authorized to deliver the notes to him but had them in his possession in order to exhibit the notes to Sikes, and subsequently, deliver them to Sikes when the trade between Sikes and Donald was closed; that in taking the notes from Burck, under the circumstances, Denison did not act in good faith as that term is used in the Negotiable Instruments Law of this state. Also, Denison did not pay a valuable consideration for the notes in question. That Murray did not become

the owner of the notes in question and they were never delivered to him.

Denison testified that in his dealings with Burck with a view to obtaining the notes, he met Burck in Hillsboro and expected the whole matter to be closed on that day; that he made a deed to the Whitney property to Murray and delivered it to Burck for Murray; that the deed was placed on record the same day. The deed was in evidence and it bears date of December 11, 1941. The consideration recited is $1,000 cash paid by Murray and the execution by Murray of one note for $250 secured by a lien on the Whitney house. In response to an inquiry by his counsel as to what he gave for the notes in controversy, Denison replied: "I was giving the remaining principal of $600 and the accrued interest would be $200.00 on which he (Murray) had paid $200.00 principal." Again his counsel asked this question: "So the amount—what you gave for this note was what he (Murray) owed you—this $600.00 note and the Whitney property?" Denison answered, "Yes, Sir," and continued by saying that he valued the property at $1,250 and made some explanations of the $1,000 cash consideration referable to the $800 that Murray owed him. Denison said in effect that he expected to get the notes from Burck when he made the conveyance of the Whitney property, but that for an explained reason Burck did not deliver the notes to him that day, but was to bring them to him at Dallas the next day; that Burck did not come for two or three or several days thereafter, and that when he did come Burck said he could not deliver the notes because of a $39 item pending between Murray and Sikes. Referable to Denison's expectation of closing the whole deal with Murray at Hillsboro by which he was to surrender to Murray the $800, he also disclosed that he did not have the $800 note but that it was with a Temple bank as security for another debt. Denison also testified that when he and Burck met at Hillsboro Burck promised to procure the notes in controversy for delivery to Denison and that he relied upon Burck to comply with his promise.

Further complicating the situation is the fact that when Burck procured the Donald notes on November 29, 1941, the record does not disclose whether they were endorsed by the payee at that time or not. Donald said he caused the notes to be delivered to Burck to be exhibited to Sikes if the trade went through, and on the same day Donald gave to Burke what he termed a memorandum of the nature of the trade Burck was to make with Sikes. That memorandum is in the record and covers a full typewritten page and is conditioned by numerous claims. It appears that Donald was to have three or four separate pieces of property cleared, certain notes which he had signed released, Sikes was to deed to Donald certain property at Mineola, Texas, and Donald was to deed same to one Blankenship, and receive $1,250 in cash and that when all of these things had been done Donald would execute a transfer of the lien to Sikes securing the notes in question.

Donald testified that that deal was never closed, but that Burck brought back to him another kind of a deal to be made with Sikes and on December 4, 1941, he delivered to Burck to enable Burck to make a different trade with Sikes a transfer of the notes in controversy bearing date December 4, 1941, and took Burck's receipt therefor in which receipt Burck agreed to return all papers within fifteen days unless the deal was closed with Sikes as per Donald's "letter dated November 29, 1941." Donald testified that no deal was ever closed with Sikes through Burck until about January 23, 1942, which he said was entirely different and involved different property from that referred to in the former negotiations.

Just here notice should be taken of the fact that Burck had procured at least not later than December 4, 1941, the notes in question endorsed in blank by the payee and a transfer of the lien to Sikes whereas the earliest deal that Denison claims to have made through Burck was on December 11, 1941. Again we are reminded that while Denison did not fix the time or day when Burck exhibited the notes to him, his estimate appears to be varying as in the latter part of 1941 two or three days after his meeting with Burck at Hillsboro on December 11th and shortly after Burck procured the notes from Donald.

Burck's deposition substantially corroborates the testimony of Donald. But he testified definitely that at the time Denison took the notes from him he apprised Denison that he was not the owner of the notes and had no authority to deliver them to anyone except Sikes and then only when certain deals then pending were closed between Donald and Sikes.

Denison's points 1, 2, and 3 assert in effect that Denison was an innocent holder in due course of the notes in question, and that Murray, Denison's predecessor in title, was likewise an innocent holder in due course; assuming these things to be true Denison asserts that he took the notes from Burck free of all defects in the title thereto as between former owners.

■ The foregoing assertions are based upon Denison's theory of what he perceives to be the facts established by the evidence. His contentions were contradicted by the testimony of Burck who said he apprised Denison at the time he took the notes that he, Burck, was not authorized to deliver the notes to him but only to Sikes when certain deals were closed. The trial court apparently disregarded Denison's theory and believed the testimony of Burck. We are bound by the findings of fact by the trial court when, as here, there is evidence to support it.

Aside from this, there is further evidence in the record that Denison did not act in good faith, in that at the end of a controversy between him and Burck, Denison refused to surrender the notes, but put them up at a bank as collateral security for his own debt. Also, he must have known that Sikes did not own the notes, for he requested a transfer of the lien and Sikes said he had no interest in them and refused to transfer them. When Denison placed the notes in question with the Temple Bank as collateral security, he took from the bank the Murray $800 note and delivered it to Burck for Murray. (The date of these transactions is not shown.) Although Denison delivered the Murray note marked paid, he refused to execute a release of the vendor's lien securing it, and later required Murray to pay $600, the unpaid principal, before he could obtain a release from Denison.

■ It is our belief that from the many obscure, if not contradictory statements, by Denison, in the record that it is the contention of Denison that he conveyed the Whitney property to Murray along with the balance of $600 owing by Murray in exchange for the notes in controversy and a vendor's lien back against the Whitney house for $250. Denison later foreclosed the lien for the $250 and recovered the property. Murray did not own the notes in controversy, and the court concluded from the facts that he never did thereafter

acquire them. Denison said he depended upon Burck to get the notes for him from Murray; they were never acquired from Murray. The deed to the Whitney property recited a consideration of $1,000 cash paid and the $250 note which Denison subsequently foreclosed and got the house back. We think the court was correct in his conclusions that Denison was not an innocent purchaser of the notes in due course, and that he did not pay a valuable consideration for them as contemplated by the law. 6 Tex.Jur. 674, sec. 70; Same Text 714, sec. 97; 8 Amer.Jur. 144.

Denison said he knew when he took the notes from Burck that Burck was not the owner. The Negotiable Instruments Act, Article 5935, Sec. 52, among other things, provides that title passes to the holder, if "at the time it (the instrument) was negotiated to him he had *no notice* of any infirmity in the instrument or defect in the title of the person negotiating it." (Emphasis ours.)

■ Points 4, 5, and 6 assert substantially that all persons who negotiate notes warrant that they have title; and that when Sikes delivered the notes to Murray and Murray delivered them to Denison, even though neither Sikes nor Murray then owned the notes, and Sikes afterwards acquired title to them, they passed to Murray by estoppel, and by the same token title passed to Denison under Murray's warranty. It is also asserted that when these negotiable notes were endorsed in blank and a written transfer by the payee was executed and placed in the hands of an agent, innocent third parties (such as Denison claims to be) dealing with the agent had the right to assume that the agent had a right to dispose of the notes.

Authorities are cited to support the contentions made, but Denison is confronted in this case with a finding of fact, supported by the evidence that Murray never did become the owner of the notes sued on, and Denison at no time dealt with Sikes, and he therefore had no express or implied warranty from Sikes.

■ The assumption asserted, that because endorsed negotiable notes were found in the possession of an agent, and Denison had been caused to deal with such agent and acquired the notes from him, that he could safely assume that the agent had authority to dispose of the notes, cannot prevail here, for the reason the court found

under the facts that Denison knew Burck was not authorized to deliver to him the notes.

The remaining 48 points presented for reversal are based upon the contentions that the court's findings of fact in each instance was not supported by the evidence, and further because the court refused to find a dozen or more fact issues requested by Denison. It would unnecessarily extend this discussion to give in detail the evidence on each findings; we have carefully read the entire statement of facts and compared it with the court's findings, and insofar as the material issues are concerned, we think there is evidence of a substantial nature to support them all.

Finding no error requiring a reversal, the judgment of the trial court will be affirmed.